# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Geoffrey Varga,

Plaintiff,

Civ. No. 12-3180 (RHK/JJK)
**MEMORANDUM OPINION
AND ORDER**

v.

U.S. Bank National Association,

Defendant.

Stephen D. Susman, Susman Godfrey LLP, New York, New York, Edgar G. Sargent, Susman Godfrey LLP, Seattle, Washington, Ashley McMillian, Susman Godfrey LLP, Houston, Texas, Steven M. Pincus, Joseph W. Anthony, Steven C. Kerbaugh, Anthony Ostlund Baer & Louwagie, P.A., Minneapolis, Minnesota, for Plaintiff.

Richard G. Wilson, Wayne S. Moskowitz, Sarah A. Horstmann, Maslon Edelman Borman & Brand, LLP, Minneapolis, Minnesota, for Defendant.

## INTRODUCTION

When Tom Petters's Ponzi scheme collapsed in 2008, hundreds of investors – from retirees to hedge funds – lost nearly everything.  Two such "losers" were the Cayman Islands-based hedge funds Palm Beach Offshore, Ltd. and Palm Beach Offshore II, Ltd. (together, the "Palm Beach Funds" or the "Funds"), which lost over $700 million. Plaintiff Geoffrey Varga is the Funds' court-appointed liquidator.  He commenced this action in December 2012 against U.S. Bank National Association ("U.S. Bank"), asserting claims of negligence and aiding and abetting breach of fiduciary duty for the bank's role in certain transactions with the company at the heart of the scheme, Petters Company, Inc.

("PCI"). Varga later filed an Amended Complaint, which U.S. Bank now moves to dismiss. For the reasons that follow, its Motion will be granted.

## BACKGROUND

### I. Petters, PCI, distressed goods, and the fraud

Petters held himself out as a savvy businessman with extensive contacts in the "distressed-goods" industry. He claimed he could obtain large quantities of consumer items – overruns, closeouts, and the like, typically electronics such as flat-screen televisions – at a steep discount, which he would then sell to big-box retailers such as Sam's Club at a hefty profit. To finance these purchases, he borrowed money through PCI, with the "investments" maturing when the retailer paid for the goods a short time later. Over more than a decade, Petters, through PCI, claimed to have purchased and sold more than $30 *billion* in distressed goods, all "financed" with investor funds.

A typical PCI "deal" was structured as follows. PCI would learn that distressed goods were "available" for purchase and it would "pre-sell" them at a profit to a big-box retailer. PCI would then obtain investor funds, in return for which it issued a high-interest-rate, short-term promissory note secured by the goods themselves, and use the funds to buy the goods. The funds would be wired to the seller, and the seller, in turn, would be directed to deliver the goods to the big-box retailer. The retailer would then pay for the goods, typically within 60 to 90 days, the investor's promissory note would be paid with interest, and PCI would keep the remainder.

This was all good in theory, but in reality the PCI deals were fake – Petters and his associates forged the purchase and sale documents, and the "sellers" of the distressed

goods were actually Petters's co-conspirators, who would wire investor funds to PCI shortly after receiving them. No payments came from retailers because no goods were actually bought and sold. Instead, PCI paid old promissory notes with the proceeds from new promissory notes, siphoning off a portion of the funds in the process. The scheme collapsed in September 2008 when a Petters insider went to authorities; the losses were staggering, with investors left holding the bag for more than $3 billion. Petters was later indicted and convicted of 20 counts of fraud, money laundering, and similar crimes and, in 2010, sentenced to 50 years' imprisonment.

## II.    The Palm Beach parties

The Palm Beach Funds were established in the mid-2000s and were investors in PCI deals, albeit indirectly. They sent their investors' money to another, related finance fund called Palm Beach Finance Partners ("Palm Beach Finance")[1] which, in turn, invested that money in PCI notes. Palm Beach Finance was founded and controlled by David Harrold and Bruce Prevost, who were also the controlling directors of the Palm Beach Funds. In addition, Harrold and Prevost owned and controlled Palm Beach Capital Management, LLC ("Palm Beach Capital Management"), which managed the investments of both the Palm Beach Funds and Palm Beach Finance.

## III.    The Direct Payment System and the Collateral Account

U.S. Bank's involvement in this case arises out of the flow of money to and from the Palm Beach Funds in the PCI deals, which Varga labels the "Direct Payment System."

---

[1] Palm Beach Finance Partners was actually two related funds, Palm Beach Finance Partners, LP and Palm Beach Finance Partners II, LP. For ease of reference, they are referred to collectively as Palm Beach Finance.

The Funds' money passed "through what was supposed to be a system of direct payments to and from" a bank account at U.S. Bank known as the "Collateral Account." (Am. Compl. ¶¶ 6, 29.) The Collateral Account was under the "sole dominion and control" of an entity called Palm Beach Capital Corp., which was controlled by Harrold and Prevost.

The Direct Payment System was structured so that the Palm Beach Funds' investment money was first transferred to the Collateral Account, and from there sent directly to the seller of the goods. (Id. ¶ 29.) After the goods were delivered, the big-box retailers were to make their payments directly to the Collateral Account. (Id.) According to Varga, this was intended to (1) prevent a third-party from having access to the funds at any point during the transaction and (2) ensure that all of the deals were legitimate. (Id. ¶ 30; accord, e.g., id. ¶ 29 ("This was a crucial structural safeguard: observable, direct payments from wholesale retailers to U.S. Bank were supposed to validate the transactions financed by the [notes] and ensure that the [merchandise] sales proceeds did not pass through [PCI]."); id. ¶ 38 ("[T]he Direct Payment System and, in particular, its Incoming Payment component, were intended to ensure that there was an observable direct payment from a [] Retailer to the Collateral Account for each transaction, demonstrating that a Merchandise Transaction funded by a Petters [] Note was *bona fide*.").) The Direct Payment System was referenced in the Palm Beach Funds' offering memoranda to investors, as well as the Funds' marketing materials. (Id. ¶¶ 32-33.) And it was memorialized in the "Collateral Agreement" establishing the Collateral Account, which

was entered into by and between U.S. Bank, Palm Beach Finance, and a Petters entity known as Petters Capital, Inc.[2]

Of course, it was impossible for money to flow to the Collateral Account from retailers, because there were no actual sales or any real merchandise being purchased. Instead, for many years "payments" to the Collateral Account came from *PCI*, which (as discovered later) was simply using newly stolen money to pay off old notes.

According to Varga, however, the Palm Beach Funds' managers and fiduciaries – Harrold and Prevost, and (derivatively) Palm Beach Capital Management – knew the Direct Payment System was not being followed and "conceal[ed] this from the Palm Beach [] Funds while continuing to invest in Petters [] Notes," thereby breaching their fiduciary duties. (Id. ¶¶ 47, 52-53.)[3] Varga also alleges that U.S. Bank, too, knew that payments to the Collateral Account came from PCI rather than retailers, noting that fact on bank statements it prepared for the Collateral Account. (Id. ¶ 43.) And, he alleges that U.S. Bank was aware, via the terms of the Collateral Agreement and the Palm Beach Funds'

---

[2] The Court may consider the Collateral Agreement (and its modifications) when ruling on the instant Motion because it is expressly referenced in the Amended Complaint. See, e.g., Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc., 406 F.3d 1052, 1063 n.3 (8th Cir. 2005). Notably, the Palm Beach Funds were *not* parties to the Collateral Agreement, as their money was invested in PCI deals only through Palm Beach Finance. Indeed, the only direct relationship between the Palm Beach Funds and U.S. Bank was through escrow accounts the Funds held at the bank – when the Funds invested in PCI deals, U.S. Bank would transfer money from the escrow accounts to the Collateral Account. (Am. Compl. ¶ 6.)

[3] Harrold and Prevost have pleaded guilty to securities fraud, admitting among other things that they misrepresented to the Palm Beach Funds' investors that payments came directly from big-box retailers, when they knew that payments actually came from PCI. (See United States v. Vennes *et al.*, Crim. No. 11-141, Doc. Nos. 32, 34 (4/21/11 Hr'g Trs.).)

marketing and offering materials (which U.S. Bank had received), that the Direct Payment System was important to the integrity of the PCI deals.   (Id. ¶¶ 49-50.)

## IV.   The Ponzi scheme collapses and litigation ensues

When the Petters scheme imploded in September 2008, the Palm Beach Funds had more than $700 million invested in PCI notes.   All of that money was lost, and the Funds went bankrupt.   The Grand Court of the Cayman Islands subsequently appointed Varga as the Funds' "official liquidator," authorizing him to "bring all legal actions on behalf of" the Funds.   (Id. ¶ 16.)

In September 2009, Varga commenced an action against Harrold, Prevost, and Palm Beach Capital Management in the United States District Court for the Southern District of Florida, alleging that each had breached fiduciary duties owed to the Funds.   (Moskowitz Decl. Ex. 1.)[4]   The docket in the Florida action indicates that the case settled in early 2011, short of trial.

Apparently having failed to recoup all of the Palm Beach Funds' losses, Varga aimed his sights elsewhere.   And so, on December 6, 2012, he commenced the instant action against U.S. Bank in the Hennepin County, Minnesota District Court, alleging that the bank (1) aided and abetted breaches of fiduciary duty by Harrold, Prevost, and Palm Beach Capital Management, and (2) conspired with Harrold, Prevost, and Palm Beach Capital Management to conceal that the Direct Payment System "was a sham."   (Doc. No.

---

[4] The Court may consider the Complaint in the Florida action and the materials appended thereto when ruling on the instant Motion.   See, e.g., Blakley v. Schlumberger Tech. Corp., 648 F.3d 921, 931 (8th Cir. 2011) (court may consider "materials that are part of the public record").

1, Ex. A.)   U.S. Bank timely removed the action to this Court and moved to dismiss; Varga responded by filing an Amended Complaint (Doc. No. 27) alleging the same aiding-and-abetting claim, dropping the conspiracy claim, and adding claims for negligence.   U.S. Bank now moves to dismiss the Amended Complaint.   The Motion has been fully briefed, the Court heard argument on June 17, 2013, and the Motion is now ripe for disposition.

## STANDARD OF REVIEW

The Supreme Court set forth the standard for evaluating a motion to dismiss in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009).   To avoid dismissal, a complaint must include "enough facts to state a claim to relief that is plausible on its face."   Twombly, 550 U.S. at 547.   A "formulaic recitation of the elements of a cause of action" will not suffice.   Id. at 555; accord Iqbal, 556 U.S. at 678.   Rather, the party seeking relief must set forth sufficient facts to "nudge[] the[] claim[] across the line from conceivable to plausible."   Twombly, 550 U.S. at 570.   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a [party] has acted unlawfully."   Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556).

When reviewing a motion to dismiss, the Court "must accept a plaintiff's specific factual allegations as true but [need] not . . . accept . . . legal conclusions."   Brown v. Medtronic, Inc., 628 F.3d 451, 459 (8th Cir. 2010) (citing Twombly, 550 U.S. at 556). The complaint must be construed liberally, and any allegations or reasonable inferences arising therefrom must be interpreted in the light most favorable to the non-moving party. Twombly, 550 U.S. at 554–56.   "Determining whether a complaint states a plausible

claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

## ANALYSIS

### I.  Aiding and abetting

Count I of the Amended Complaint alleges that U.S. Bank aided and abetted breaches of fiduciary duties owed to the Palm Beach Funds by Harrold, Prevost, and Palm Beach Capital Management.   There are several problems with this claim.

### A.  What duties were owed?

It is axiomatic that liability for *aiding and abetting* a breach of fiduciary duty cannot exist without an *underlying* breach of that duty.   But this creates a choice-of-law issue. The Palm Beach Funds were formed in the Cayman Islands and, hence, whatever duties they were owed must have arisen under Cayman Islands law.   See, e.g., Potter v. Pohlad, 560 N.W.2d 389, 391 (Minn. Ct. App. 1997) (under the "internal affairs doctrine," the fiduciary duties of a corporation's directors are "generally governed by the law of the state of incorporation");[5] Feiner Family Trust v. VBI Corp., No. 07 Civ. 1914, 2007 WL 2615448, at *5 (S.D.N.Y. Sept. 11, 2007) (applying law of the Cayman Islands in shareholder derivative suit); Meng v. Schwartz, 305 F. Supp. 2d 49, 58 (D.D.C. 2004) (applying Bermuda law to breach-of-fiduciary-duty and negligence claims).   Here, Varga

---

[5] As the Court is sitting in diversity, it must look to Minnesota's choice-of-law rules to resolve any conflict-of-law questions.   See, e.g., Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).   Minnesota courts routinely apply the internal affairs doctrine to breach-of-fiduciary-duty claims.   See, e.g., Transocean Grp. Holdings Pty Ltd. v. S.D. Soybean Processors, LLC, 663 F. Supp. 2d 731, 742 n.5 (D. Minn. 2009) (Tunheim, J.); Rupp v. Thompson, No. C5-03-347, 2004 WL 3563775, at *3 (Minn. Dist. Ct. Mar. 17, 2004).

has cited cases from several jurisdictions regarding different duties ostensibly owed to the Funds (<u>see</u> Mem. in Opp'n at 14-17), yet none arises under Cayman Islands law.

To be sure, the Amended Complaint *does* allege that the Palm Beach Funds were owed "the duties of care, loyalty, and good faith" (Am. Compl. ¶¶ 69-70), although neither it nor Varga's Memorandum has identified the source of those duties.   <u>See</u> <u>Henneberry v. Sumitomo Corp. of Am.</u>, 532 F. Supp. 2d 523, 552 (S.D.N.Y. 2007) ("Simply stating a duty existed does not make it so.").   More problematic, the Amended Complaint fails to specify *which* of these duties were ostensibly breached here.   Such broad-brush generalizations will not suffice.   <u>See</u> <u>Twombly</u>, 550 U.S. at 555 (pleading rules require "more than labels and conclusions").[6]

## B.    Was there a breach?

In any event, it appears clear that at least some fiduciary duties were owed to the Funds under Cayman Islands law.   <u>See, e.g.</u>, <u>In re Refco Inc. Sec. Litig.</u>, 826 F. Supp. 2d 478, 500 (S.D.N.Y. 2011).   What is *not* clear is whether Varga has sufficiently pleaded breaches thereof.[7]

For example, the Amended Complaint alleges that Harrold, Prevost, and Palm Beach Capital Management directed U.S. Bank to "re-code" the Collateral Account's monthly bank statements to "indicate[] that the source of the payments was a" big-box

---

[6] This problem was highlighted at oral argument, when Varga's counsel asserted breaches of the duties of "care and *candor*" (6/17/13 Hr'g Tr. at 32-33 (emphasis added)) – the latter never having been alleged.

[7] The parties dispute whether Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements apply to the aiding-and-abetting claim.   (Def. Mem. at 21; Mem. in Opp'n at 14-15.) The Court need not resolve that dispute, because the Amended Complaint fails to adequately plead this claim even under the liberal requirements of Federal Rule of Civil Procedure 8.

retailer, in order to "conceal" that "payments were [actually] being received from" PCI. (Am. Compl. ¶ 44; accord, e.g., Mem. in Opp'n at 10.)   But the Amended Complaint nowhere identifies *who* received these monthly statements, and presumably it would have only been the parties to the Collateral Agreement (which established the Collateral Account).   It is unclear, therefore, how this alleged "concealment" could have misled *the Palm Beach Funds*, which were not parties to the agreement and are not alleged to have seen the monthly statements.   Without any indication otherwise, this allegation does not plausibly plead a breach of fiduciary duty.   See, e.g., Hamilton v. Bangs, McCullen, Butler, Foye & Simmons, LLP, 687 F.3d 1045, 1051-52 (8th Cir. 2012) (plaintiff must show breach of fiduciary duty proximately caused his injuries); In re Refco, 826 F. Supp. 2d at 500 (noting that Cayman Islands cases "require a showing of proximate cause" to establish breach of fiduciary duty).[8]

It could be argued that the Funds were aware of the changes to the monthly account statements because their *directors* (Harrold and Prevost) were so aware – indeed, they allegedly *ordered* it.   (Am. Compl. ¶ 77.)   But Varga does not press this argument, in fact taking pains to distinguish between Harrold and Prevost, on one hand, and the Palm Beach Funds (of which they were directors) on the other.   (See Mem. in Opp'n at 16.)   This is likely because without drawing such a distinction, everything Harrold and Prevost knew

---

[8] Varga stands before the Court only on behalf of the Funds and not anyone else.   Accordingly, breaches of fiduciary duties owed to others, such as investors, would not aid his cause.   For this reason, the guilty pleas by Harrold and Prevost do not automatically satisfy Varga's obligation to plead a breach of fiduciary duty – Harrold and Prevost pled guilty to misleading *investors*, not the Palm Beach Funds themselves.

would have also been known by the Funds, belying the contention that Harrold and Prevost "concealed" information from the Funds – the crux of Varga's claims.

### C. Did U.S. Bank have knowledge and substantially assist?

Even if Varga had successfully pleaded a breach of fiduciary duty by Harrold, Prevost, and/or Palm Beach Capital Management, he would have discharged only a portion of his burden. To state a claim for *aiding and abetting* such a breach under Minnesota law,[9] he must also plead facts showing that U.S. Bank (1) had knowledge of the breach and (2) substantially assisted it. E.g., Witzman v. Lehrman, Lehrman & Flom, 601 N.W.2d 179, 187-88 (Minn. 1999); In re Tempromandibular Joint (TMJ) Implants Prods. Liab. Litig., 113 F.3d 1484, 1495 (8th Cir. 1997) (aiding and abetting liability "attaches when one actor knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself") (internal quotation marks omitted). Knowledge and substantial assistance are evaluated "in tandem," with a greater showing of one requiring a lesser showing of the other. Witzman, 601 N.W.2d at 188. In the Court's view, the Amended Complaint falls short on both.

#### 1. Knowledge

Knowledge is a "crucial element in aiding and abetting cases." E-Shops Corp. v. U.S. Bank Nat'l Ass'n, 678 F.3d 659, 663 (8th Cir. 2012); accord, e.g., Camp v. Dema, 948 F.2d 455, 459 (8th Cir. 1991) ("[T]he knowledge element is critical."). While knowledge

---

[9] Because the alleged duties arise under Cayman Islands law, it is possible that a claim for aiding and abetting also arises under Cayman Islands law. As neither party raises this choice-of-law issue, the Court follows their lead and analyzes the elements of aiding and abetting under Minnesota law. See, e.g., BBSerCo, Inc. v. Metrix Co., 324 F.3d 955, 960 n.3 (8th Cir. 2003) (law of forum applies by default when choice of law not raised by either party).

may be shown by circumstantial evidence, "courts stress that the requirement is *actual*
knowledge and the circumstantial evidence must demonstrate that the aider-and-abettor
*actually knew* of the underlying wrongs committed." Wiand v. Wells Fargo Bank, N.A.,
__ F. Supp. 2d __, 2013 WL 1401414, at *3 (M.D. Fla. Apr. 5, 2013) (emphases in
original); accord, e.g., Camp, 948 F.2d at 459. Constructive knowledge will not suffice,
El Camino Res. Ltd. v. Huntington Nat'l Bank, 712 F.3d 917, 922 (6th Cir. 2013), and it is
not enough to plead awareness of the conduct in question, Camp, 948 F.2d at 459, that it
raised "red flags," Wiand, 2013 WL 1401414, at *3 (quoting Lerner v. Fleet Bank, N.A.,
459 F.3d 273, 294 (2d Cir. 2006)), or even that it amounted to gross negligence, Camp, 948
F.2d at 463. Rather, Varga must plead facts plausibly suggesting U.S. Bank was aware of
the *wrongfulness* of the challenged conduct. Witzman, 601 N.W.2d at 187; Camp, 948
F.2d at 459.

Here, while the Amended Complaint pleads facts showing U.S. Bank was aware
certain conduct was being undertaken by the Palm Beach Funds' fiduciaries, it is sorely
lacking in facts suggesting the bank *had actual knowledge such conduct was wrongful.*
Varga alleges that U.S. Bank knew (1) the importance of the Direct Payment System;
(2) the Funds' fiduciaries (Harrold, Prevost, and Palm Beach Management) were aware the
system was not being followed; and (3) the fiduciaries were concealing the source of
incoming payments from the Funds. According to Varga, U.S. Bank must have known
from these facts that Harrold, Prevost, and/or Palm Beach Management were breaching
fiduciary duties, because of the Direct Payment System's "significance" to the investments

and the fact that "it was reflected in legally binding documents such as the Collateral Agreement and" the Funds' offering documents.   (Mem. in Opp'n at 21-22.)

But even accepting these allegations as true, they do not adequately plead that U.S. Bank knew a breach of fiduciary duty to the Funds was taking place.[10]   To be sure, the Amended Complaint alleges that the Direct Payment System was intended to mitigate risks associated with the Funds' investments.   Yet despite Varga labeling the system as "crucial" (Am. Compl. ¶ 75), nothing in the Collateral Agreement or the Funds' offering documents *mandated* that funds travel in the fashion described.   Indeed, those documents made clear only that PCI would "*direct* each [retailer] to make all payments" to the Collateral Account (Geist Decl., Ex. B § 1(b) (Collateral Agreement) (emphasis added); Moskowitz Decl. Ex. 1, attach. A-1 at 12 (offering memorandum)); they did not *require* payments be made in this way.   The recitals to the Collateral Agreement, too, noted only that Palm Beach Finance had "*requested* that . . . all collections received from [retailers] be . . . remitted by wire transfer directly to" the Collateral Account.   (Geist Decl. Ex. B, Recital C (emphasis added).)   Further, the Collateral Agreement expressly contemplated that money could be tendered to the Collateral Account by PCI, and U.S. Bank had no discretion to refuse that money.   (Id. § 4(a) ("The Bank shall . . . [a]pply and credit for deposit to the Collateral Account . . . Receipts [defined as all cash, checks, or other items of value that PCI paid to or deposited with U.S. Bank] from time to time tendered by or on behalf of [PCI] for deposit therein.").)

---

[10]  Recall that the fiduciary duties arose under *Cayman Islands* law.   In other words, Varga must allege that U.S. Bank knew what such duties were and that the fiduciaries were breaching them.

Moreover, Varga's allegations ignore the transactions' context – he overlooks that the Palm Beach Funds were timely paid on their investments in PCI notes for several years without any problems, apparently with full knowledge by the fiduciaries that the Direct Payment System was not being followed and that funds were being received from PCI, not retailers.   Given this fact, the Court perceives no reason why U.S. Bank would (or should) have leapt to the conclusion that the Funds' fiduciaries were breaching their obligations by "ignoring" the Direct Payment System.[11]

Varga also attempts to show knowledge by pointing out that the Funds' fiduciaries directed U.S. Bank to change the Collateral Account's monthly statements.   (Mem. in Opp'n at 18-19, 22.)   But as noted above, there is no allegation the Palm Beach Funds saw those "misleading" statements, or more importantly, that U.S. Bank *knew* the Funds saw them.   Moreover, the account statements prior to the change (which occurred in December 2006) showed that payments were being received directly from PCI.   Hence, it is hard to understand why U.S. Bank should have understood this change as a breach of fiduciary duty, "somehow retroactively conceal[ing]" the source of the payments from the Funds (assuming they had seen the statements in the first place).   (Def. Mem. at 27.)

At bottom, the Amended Complaint, in the Court's view, pleads nothing more than facts suggesting U.S. Bank *should have known* duties were being breached.   This does not suffice.   E.g., SEC v. Shanahan, 646 F.3d 536, 547 (8th Cir. 2011) ("[A] bare inference

_____

[11] This same logic undermines Varga's contention that U.S. Bank knew the fiduciaries were breaching duties by continuing to invest in PCI notes notwithstanding the failure to adhere to the Direct Payment System.   (Mem. in Opp'n at 23-24.)

that the defendant must have had knowledge of the primary violator's transgressions is insufficient.") (quoting Camp, 948 F.2d at 459).

## 2. Substantial assistance

Even if Varga had made some minimal showing of knowledge, his claims would falter on the element of substantial assistance. Substantial assistance requires an "affirmative step" on the part of the aider-and-abettor, Am. Bank of St. Paul v. TD Bank, N.A., 713 F.3d 455, 463 (8th Cir. 2013), that is a "substantial factor" in causing the breach of duty, Camp, 948 F.2d at 460. It is not enough for an aider-and-abettor to act in some way that incidentally advances the breach. Id. Rather, the conduct in question must be undertaken with "some degree of knowledge" (1) of its wrongful purpose and (2) that it is aiding the tortfeasor. Id.; accord, e.g., In re TMJ, 113 F.3d at 1496 (noting that assistance must be undertaken "with the intention of advancing the tortious activity"). "If it were otherwise, aiding and abetting would be indistinguishable from simply aiding. This would cast too wide a net, bringing under it parties involved in nothing more than routine business transactions." Camp, 948 F.2d at 459.

To determine what constitutes substantial assistance, courts generally consider the five factors listed in the comments to section 876 of the Restatement (Second) of Torts. See, e.g., Witzman, 601 N.W.2d at 188; In re TMJ, 113 F.3d at 1495. Those factors are: the nature of the act encouraged, the amount of assistance given, the aider-and-abettor's presence or absence at the time of the tort, its relation to the primary actor, and its state of mind. In re TMJ, 113 F.3d at 1495. Considering those factors here, and remaining "[m]indful of the potentially devastating impact aiding and abetting liability might have on

commercial relationships," K & S P'ship v. Cont'l Bank, N.A., 952 F.2d 971, 980 (8th Cir.

1991), the Court concludes that the Amended Complaint does not plausibly suggest U.S.

Bank substantially assisted the fiduciaries in breaching duties owed to the Funds.

Taking the final factor first, little in the Amended Complaint suggests that U.S.

Bank acted with a culpable state of mind.   And indeed, it strains logic to assume that a

large commercial bank would knowingly aid breaches of fiduciary duties in connection

with transactions worth hundreds of millions of dollars, potentially putting itself on the

hook for that amount in the process, without some kind of incentive.   But the Amended

Complaint pleads none.   Nothing indicates that U.S. Bank was collecting hefty fees from

either the fiduciaries or the Palm Beach Funds, through the Collateral Account or

otherwise, that might justify taking such a huge financial risk.   The Amended Complaint

simply offers no answer to the critical question:   What financial incentive did U.S. Bank

have to act in this fashion?   Or put more succinctly:   Why?

The "relationship" factor also militates against substantial assistance.   The

Amended Complaint suggests no relationship between U.S. Bank and the fiduciaries

(Harrold, Prevost, and Palm Beach Capital Management) who allegedly breached their

duties.   At most, there existed a relationship between the bank and entities *controlled* by

the fiduciaries, including the Palm Beach Funds and Palm Beach Finance, but these were

simply arms-length, commercial relationships.   See Witzman, 601 N.W.2d at 189

("'[S]ubstantial assistance' means something more than the provision of routine

professional services.").

Finally, it is noteworthy that U.S. Bank was not retained to provide investment or other advice to the fiduciaries, but simply was hired to process the transactions – take money from Palm Beach Finance, distribute it to the "sellers," and then receive and process payments back from the "buyers" after the goods were sold. This shows that both the amount and the nature of the assistance given was small. U.S. Bank simply did what any bank does on a daily basis.

In sum, the relevant factors do not plausibly suggest substantial assistance here. None of Varga's arguments to the contrary is availing.

Varga first attempts to show substantial assistance by noting that U.S. Bank accepted and processed payments "despite its awareness that the direct payment system was *required* by the Collateral Agreement and *promised* in" the Funds' offering documents. (Mem. in Opp'n at 26 (emphases added).) But as already discussed, these assertions are inaccurate. Neither the Collateral Agreement nor the Funds' offering documents required that money travel via the Direct Payment System – they simply indicated that PCI would direct retailers to make payments to the Collateral Account, saying nothing about what would happen if retailers failed to follow those directives. Varga also argues that U.S. Bank "should not have . . . accept[ed] deposits directly from" PCI (id. at 26), but yet again, the Collateral Agreement belies that argument. (See supra at 13 ( "The Bank shall . . . [a]pply and credit for deposit to the Collateral Account . . . Receipts from time to time tendered by or on behalf of [PCI] for deposit therein.").)

Varga's primary bone of contention appears to be that U.S. Bank processed payments, knowing they were coming from PCI and not retailers, "without ever alerting

the [Palm Beach] Funds and other interested parties to the failure to follow" the Direct Payment System.  (Mem. in Opp'n at 26.)   But even assuming U.S. Bank would have been permitted to make such disclosures without violating the confidentiality of its customers, failing to alert others cannot constitute substantial assistance as a matter of law: "Liability [must be] based on [U.S. Bank's] affirmative acts, *not acts it should have taken*." Am. Bank, 713 F.3d at 463 (emphasis added); accord, e.g., Benford v. City of Minneapolis, Civ. No. 10-4539, 2012 WL 6200365, at *6 (D. Minn. Dec. 12, 2012) (Montgomery, J.) ("Generally speaking, knowledge of a violation combined with inaction does not constitute 'substantial assistance.'").

Varga also attempts to show substantial assistance by pointing out that a U.S. Bank employee (Thomas Caruth) informed a third-party (Jonathan Spring, who was both an investor in and a marketer of the Palm Beach Funds) that payments were being made by retailers, and that he made similar misrepresentations to other third parties.   (Mem. in Opp'n at 27; Am. Compl. ¶¶ 39, 56.)   Even assuming that allegation as true, there are no facts alleged to suggest this was anything other than an error by Caruth – notably, the Amended Complaint does *not* allege Caruth knew the information he was providing was inaccurate.   See E-Shops, 678 F.3d at 664 (no substantial assistance when complaint contained no allegations bank knew information it provided was false).[12]   And certainly nothing in the Amended Complaint indicates that Caruth made these statements *for the purpose of furthering breaches of fiduciary duties*.   More importantly, the "false"

_____

[12]  At oral argument, Varga's counsel asserted that Caruth "said something . . . false [while] [h]e knew the truth."   (6/17/13 Hr'g Tr. at 32.)   But the Amended Complaint contains no such allegation.

statements were made to investors, not the Palm Beach Funds themselves.  Varga, therefore, cannot show that the statements caused any harm to the Funds, the only entities he represents here.  See In re TMJ, 113 F.3d at 1495 ("[T]he alleged substantial assistance must be the proximate cause of the plaintiffs' harm.").

Lastly, Varga points to the changes to the Collateral Account monthly statements, arguing they constituted substantial assistance.  (Mem. in Opp'n at 28-29.)  But this contention, too, fails for lack of causation, absent some allegation the Palm Beach Funds actually saw the statements.

For all of these reasons, the Court concludes that the Amended Complaint fails to plead facts suggesting knowledge or substantial assistance on the part of U.S. Bank.  The aiding-and-abetting claim must be dismissed.

## II.    Negligence

The remaining claims, labeled "willful and wanton negligence" (Count II) and "gross negligence" (Count III), respectively, allege that U.S. Bank breached duties owed to the Palm Beach Funds, based on the same facts recited above.  Under Minnesota law, which both parties agree applies to these claims, the elements of negligence are (1) a duty, (2) breach, (3) causation, and (4) damages.  E.g., Gilbertson v. Leininger, 599 N.W.2d 127, 130 (Minn. 1999).  U.S. Bank argues that these claims fail due to the absence of an enforceable duty; the Court agrees.

"Any legal analysis of an action . . . alleging negligence must begin with an inquiry into whether the [defendant] owed the [plaintiff] a duty."  Louis v. Louis, 636 N.W.2d 314, 318 (Minn. 2001).  "Existence of a duty in a negligence case is a question of law."

<u>Funchess v. Cecil Newman Corp.</u>, 632 N.W.2d 666, 672 (Minn. 2001). Here, Varga argues that U.S. Bank knew the Palm Beach Funds "were placing their trust in U.S. Bank and relying on [it] as custodian of the Collateral Account." (Mem. in Opp'n at 32.) As a result, he contends that the bank had a "duty to safeguard" the Collateral Account "for [its] beneficiaries." (<u>Id.</u> (quoting Am. Compl. ¶ 82).) He further asserts that the Funds were "relying on U.S. Bank to counsel and inform them" and, hence, they were owed a duty "not to misrepresent the source of incoming payments." (<u>Id.</u> at 33.)

But rather than support these contentions, the facts pleaded in the Amended Complaint undermine them. The Palm Beach Funds were not parties to the Collateral Agreement, belying Varga's assertion that they were "placing their trust in" U.S. Bank and "relying on" it as "custodian" of the Collateral Account. Furthermore, the Collateral Agreement makes clear that the funds in the Collateral Account were held only for the benefit of the parties to that agreement – in other words, *not* the Palm Beach Funds. (Geist Decl. Ex. B § 1(a).) And, the Collateral Agreement also makes clear that U.S. Bank would owe no liability to third parties – which necessarily includes the Palm Beach Funds – for actions taken (or not taken) by the bank pursuant to the agreement. (<u>Id.</u> § 9(a)(1).) There is simply no support for the contention that the Palm Beach Funds were somehow beneficiaries of the Collateral Account, and therefore owed a duty by U.S. Bank.[13]

As for the allegation that the Palm Beach Funds were "relying on U.S. Bank to counsel and inform them," Varga nowhere identifies where that (supposed) duty emanated

---

[13] Indeed, had the Funds been third-party beneficiaries of the Collateral Account under the terms of the Collateral Agreement, Varga likely would have asserted a breach-of-contract claim against U.S. Bank.

from. And nothing in the nature of the relationship between the Funds and U.S. Bank suggests the bank had any obligation to inform the Funds about anything, least of all the nature of the transactions in an account in which the Funds had no ownership interest. Distilled to its essence, Varga's allegation boils down to a complaint that U.S. Bank breached a duty to prevent fraud from passing through one of its accounts. No such duty exists. See Hurley v. TCF Banking & Sav., F.A., 414 N.W.2d 584, 587 (Minn. Ct. App. 1987) (noting that a bank "is not in a fiduciary relationship with a customer, rather the relationship is one of debtor and creditor," and without "special circumstances," it owes no duty); see also Guardian Angel Credit Union v. MetaBank, No. 08-cv-261, 2011 WL 2784078, at *6 (D.N.H. July 14, 2011) (noting that "a bank does not have a general duty to protect non-customers from torts involving its accounts").

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that U.S. Bank's Motion to Dismiss (Doc. No. 30) is **GRANTED**, and this action is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: July 2, 2013                                    s/Richard H. Kyle
                                                        RICHARD H. KYLE
                                                        United States District Judge